IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

| | | |
|---|---|---|
| LINDA JO ROBINSON, as Administrator and Personal Representative of the Estate of Kimberly Nell Robinson, deceased, | * * * * | |
| Plaintiff, | * * * | |
| vs. | * * * * * | No. 5:05cv00139 SWW |
| UNITED STATES OF AMERICA, | * * | |
| Defendant. | * | |

MEMORANDUM AND ORDER

Linda Jo Robinson ("Robinson"), as Administrator and Personal Representative of the Estate of Kimberly Nell Robinson ("Kim"), her deceased daughter, brings this pro se action against the United States of America under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671 *et seq.*, for damages based upon the alleged medical malpractice of Dr. Mark A. Ramiro. The matter was tried to the Court on February 11, 2008. This Memorandum and Order constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).[1]

I.

On August 29, 2002, Dr. Ramiro first saw Kim, then 40 years of age, at his federally-funded clinic in Rison, Arkansas. Kim was diagnosed with an umbilical hernia and morbid obesity, her weight approaching 500 pounds. Dr. Ramiro determined not to do anything about

---

[1] This Memorandum and Order was prepared without benefit of a certified transcript of the proceedings.

the hernia at that time, but to observe it for strangulation. Kim was also slightly anemic, and Dr. Ramiro, as was his usual practice, advised her to take over the counter iron supplements.

Dr. Ramiro again saw Kim on September 30, 2002. Apparently, this and the first visit were more or less visits for refills on medications. In any case, Kim was told to return in October 2002, but she did not return for some ten months. Robinson stated Kim didn't return when told to because she would have been returning right before Thanksgiving and Christmas and she had gotten off her diet and she wasn't having problems with her hernia.

On August 21, 2003, Dr. Ramiro again saw Kim and, along with her morbid obesity and hernia, diagnosed her with dysfunctional uterine bleeding, which according to Kim had been occurring on and off for six years. Kim remained slightly anemic, and Dr. Ramiro determined to refer her to a gynecologist and surgeon for possible gastric bypass.

On August 28, 2003, pursuant to the referral from Dr. Ramiro, Kim was seen by Dr. Charles Mabry, a general surgeon. Dr. Mabry noted that Kim was referred to him for three separate problems: an umbilical hernia that has been causing lower abdominal pain, continuous menorrhagia and possible endometriosis, and consideration for possible morbid obesity surgery.[2] Dr. Mabry noted that Kim "suffers many complications from her morbid obesity including inability to exercise, inability to walk any significant distance, fluid retention as well as venous stasis disease of her legs." Dr. Mabry determined to start evaluating her overall medical condition to undergo general anesthesia and to refer her to a gynecologist for their evaluation of her menorrhagia.

On September 3, 2003, pursuant to the referral from Dr. Mabry, Kim was seen by Dr.

---

[2] "Menorrhagia" is excessive uterine bleeding occurring at the regular intervals of menstruation, the period of flow being of greater than usual duration. *Dorland's Illustrated Medical Dictionary* 1106 (27th ed. 1988).

Reid Pierce, a gynecologist. Dr. Pierce noted that his exam was limited to an attempted pelvic exam on the electric exam table, but that due to Kim's size and anxiety, she was not able to recline completely. He noted that

> [i]n absence of full reclining position, the panniculus obscured the introital area and the angle of the vaginal barrel was such that visualization of the vaginal area was precluded. The patient could not mobilize her perineum to the end of the table. An attempt at vaginal ultrasound was also made, which also proved to be less than satisfactory due to the position of the patient and also due to her increasing anxiety and discomfort with the procedure. However, there was a glimpse of what appeared to be a bulky uterus with a thickened endometrium. No significant bleeding was noted today.

Dr. Pierce stated that this "[u]nfortunate lady suffers from extreme obesity and undoubtedly longstanding anovulatory menometrorrhagia. Of utmost concern is the possibility of endometrial neoplasia and it had been my hope[] to perform a biopsy today."[3] Dr. Pierce stated that Kim was made aware of the need for specialized care regarding her bariatric [*i.e.*, overweight] condition" and noted that "[i]t would be my opinion that any further investigation will probably require modalities unavailable here. We will be in touch with Dr. Mabry regarding same and make hopefully necessary referrals."

On September 15 or 18, 2003, Kim returned to Dr. Ramiro's Rison clinic. Kim was noted to still bleed a lot whenever she moved and that she needed to see a gynecologist in Little Rock for her dysfunctional uterine bleeding as Dr. Pierce was unable to do a full examination in light of Kim's obesity. It was noted as well that the gastric bypass surgeon would only do the procedure after a thorough work-up was done to rule out uterine malignancy, etc.

---

[3] "Neoplasia" refers to the progressive multiplication of cells under conditions that would not elicit, or would cause cessation of, multiplication of normal cells. *Dorland's Illustrated Medical Dictionary* at 1105. The government's witness, Dr. Kerry Pennington, a family practitioner, testified in his deposition that Dr. Pierce was referring to uterine cancer when he made that statement.

On September 22, 2003, Kim went to the emergency room at the University of Arkansas for Medical Sciences ("UAMS") because of increasing abdominal pain. Kim was noted to have a ventral hernia and leukocytosis.[4] Kim was advised to be admitted to UAMS, but she left Against Medical Advice ("AMA"). Robinson states Kim left AMA because UAMS refused to have a gynecology/oncology consult which was the only reason they went to UAMS. Robinson states that Kim already had an appointment with Dr. Joseph Jensen of UAMS for October 16, 2003, and so there was no reason to stay at UAMS.

On September 25, 2003, Dr. Pierce referred Kim to UAMS for an evaluation of Kim's dysfunctional uterine bleeding. Kim was referred to the emergency department for a surgical consult, but Kim stated she didn't want to go because she had to wait in the emergency room for several hours during her last visit. Kim was informed that if she went to the emergency department for a surgical evaluation, the gynecological team could perform the necessary gynecological tests at that time and, if needed, provide appropriate procedures. Kim, however, stated she would attempt to contact the surgery department for a visit.

On October 7, 2003, Kim returned to the Rison clinic and Dr. Fauzia Qadir (Dr. Ramiro was on medical leave) directed that Kim be admitted to JRMC. Kim was admitted to JRMC on October 8, 2003, "secondary to elevated white blood cell count associated with foul-smelling discharge from an umbilical hernia." Because of her weight, JRMC did not have the facilities needed to treat Kim and determine the cause of her leukocytosis. Dr. Quimosing at JRMC referred to Kim's hernia as infected and in need of surgical evaluation for emergency excision, but noted that she needs specialized care regarding her obesity and would require modalities

---

[4] "Leukocytosis" is a transient increase in the number of leukocytes (white blood cells) in the blood, resulting from various causes, as hemorrhage, fever, infection, inflammation, etc. *Dorland's Illustrated Medical Dictionary* at 915.

unavailable at JRMC.[5] Following consultations with doctors, including Dr. Jensen at UAMS, Kim, on October 16, 2003, was discharged from JRMC with her and Robinson's agreement and transferred to UAMS with a final diagnosis of leukocytosis/infected umbilical hernia, dysfunctional uterine bleeding with iron deficiency anemia, and morbid obesity.[6]

On October 16, 2003, Kim arrived at UAMS and was found to have an incarcerated umbilical hernia for which urgent surgical repair was recommended.  The following day, Kim was taken to the operating room for her incarcerated umbilical hernia.  During the procedure, performed by Dr. Jensen and Dr. Julio Arias, enlarged uterus and nodules were seen on the peritoneum, omentum and bladder.  An urgent gynecological consult was placed at this time and the gynecological team examined the uterus and felt that it was a malignant process.  Specimens were sent for testing, which were positive for metastatic carcinoma.  Following post-operative recovery, Kim was discharged from UAMS on October 23, 2003, and informed that she would be contacted in approximately one week with the final pathology report on the biopsies that were taken intraoperatively.

On October 25, 2003, Kim was admitted to JFRC with complaints of post-operative nausea and vomiting.  Kim presented with leukocytosis and a D-dimmer test was ordered, which was positive.  Kim was immediately started on the drug Lovenox, a blood thinner.  The next day,

---

[5] Robinson claims Dr. Ramiro and Dr. Mabry kept insisting that JRMC could not accommodate Kim because of her size, which Robinson states was not true, but Robinson has not established that JRMC in fact had the facilities to accommodate Kim.

[6] Robinson claims Dr. Ramiro either neglected her request for a second opinion by a Dr. Blitzer or discouraged it, thereby violating Kim's right to a second opinion, but Dr. Ramiro's note on October 16, 2003, suggests he spoke with Dr. Bitzer. In any case, Dr. Mabry had already consulted, and plaintiff and Kim had agreed to the transfer to UAMS.  Dr. Pennington stated he did not think whether Dr. Bitzer saw Kim or not impacted her care or her results.

Kim's platelet count began to drop and she subsequently developed thromboctopenia.[7]

On October 28, 2003, at the request of Dr. Ramiro, Kim was seen by Dr. Omar Atiq, a hematologist and oncologist. Dr. Atiq recommended that Kim transfer to UAMS for gynecology/oncology services, but Robinson refused. Dr. Atiq wrote,

> I have discussed the situation with the patient and then with her mother on the telephone, at the patient's request, in detail. I have explained her condition, the natural history of her disease, and the therapeutic options available to her along with their pros and cons, and the rational for my recommendation of continued care at UAMS. The patient and her mother appear to understand the situation, but they also appear to be hesitant about going back to UAMS. In fact, the mother told me that she did not want the patient to go to UAMS because of the reportedly poor treatment that they had received there. However, I made it clear that from a medical standpoint, I believe it would [be] best that she be treated at a University Medical Center rather than here ....

Dr. Ramiro and Dr. Sue Frigon, Robinson's own consultant, likewise recommended that Kim transfer to UAMS. Dr. Ramiro wrote:

> Received final pathology results from UAMS. Dr. Atiq ... recommended that she best be referred back to UAMS for further treatment and that JRMC may not be able to provide for her special needs. I have discussed this with patient/mother and both are against this. They claim that they have been treated poorly in Little Rock and that mother will not be able to make the trip back and forth to Little Rock because she had animals/cat to take care of at home. She also had an old truck that might not make it up there. I have spent considerable amount of time explaining the risks but the patient and her mother are vehemently against going back to Little Rock.

Dr. Frigon, in turn, wrote:

> <u>This</u> pt needs to go to UAMS. They can do CT in-house rather than transport to outside facility, etc. I understand the mother's reluctance – <u>however</u> this is `a medical issue <u>not</u> convenience.

Robinson, however, states that in making excuses for not sending Kim back to UAMS, she was trying to be polite and didn't want to say to the doctors that she wouldn't take her

---

[7] "Thromboctopenia" is a decrease in the number of blood platelets. *Dorland's Illustrated Medical Dictionary* at 1717.

daughter back to UAMS because of the way Kim was treated; she states Kim didn't want to go back because they made fun of her because of her size after surgery and kept making fun of her every time she needed help.

Kim's symptoms from her post-operative admission to JRMC apparently improved somewhat. However, on November 2, 2003, Kim became restless and experienced the sudden onset of cardiopulmonary arrest. She was resuscitated for 22 minutes before a heart rate was obtained. Unfortunately, the hypoxia suffered by Kim during the 22 minutes resulted in "minimal brain activity" and Robinson states she was told Kim was brain dead. Shortly after this episode, Dr. Noormahal Kabani called in a verbal order which allowed for the administration of morphine. Kim died on November 4, 2003, with Dr. Ramiro listing her probable cause of death as consumptive coagulopathy secondary to extensive malignancy/sepsis.[8]

## II.

In actions brought under the FTCA, courts are bound to apply the law of the state in which the acts complained of occurred. *See, e.g., Goodman v. United States*, 2 F.3d 291, 292 (8th Cir. 1993). Here, the actions complained of occurred in Arkansas and so it is that state's law that will be applied to Robinson's claims.

Pursuant to Ark. Code Ann. § 16-114-206, the plaintiff in a medical malpractice case has the burden of proving by expert testimony (1) the degree of skill and learning ordinarily possessed and used by members of the profession of the medical care provider in good standing,

---

[8] Robinson claims Dr. Ramiro falsely denied under oath that she had requested an autopsy, but the Record of Death Nurse's Checklist, signed by the nurse on November 4, 2003, shows the autopsy consent was not signed and shows release of body to funeral home. The signature line shows **X Linda Robinson, verbal request /S Smith, LPN**. Robinson presents no evidence that the nurse signing this checklist was being untruthful.

engaged in the same type of practice or speciality in the locality in which he or she practices or in a similar locality, (2) that the medical provider failed to act in accordance with that standard, and (3) that such failure was the proximate cause of the plaintiff's injuries. *Williamson v. Elrod*, 348 Ark. 307, 311, 72 S.W.3d 489, 492 (2002); *Reagan v. City of Piggott*, 305 Ark. 77, 80-81, 805 S.W.2d 636, 637 (1991). Expert testimony is not per se necessary in every malpractice case, however. *Haase v. Starnes*, 323 Ark. 263, 268, 915 S.W.2d 675, 677-78 (1996). Rather, expert testimony is required only when the asserted negligence does not lie within the jury's comprehension as a matter of common knowledge, when the applicable standard of care is not a matter of common knowledge, and when the jury must have the assistance of experts to decide the issue of negligence. *Id.*

Unlike claims that a doctor failed to sterilize an instrument or left a foreign object inside the patient, *see, e.g., Eady v. Landsford*, 351 Ark. 249, 258, 92 S.W.3d 57, 62 (2002), Robinson's allegations of negligence against Dr. Ramiro are not matters of common knowledge. Robinson, who states she has been a Licensed Practical Nurse for 25 years, claims that Dr. Ramiro did not conduct tests to determine whether Kim had cancer; did not do anything when Kim's platelet count began dropping; inappropriately referred her to the surgeons at UAMS and not to gynecology/oncology, which is where she states he should have referred her; failed to do anything to determine the cause of Kim's anemia which persisted for a year even though she had been taking iron supplements; did not determine the cause or treat Kim's leukocytosis; neglected to determine causes of abnormal blood work during Kim's first admission to JRMC; misdiagnosed Kim's condition on post-operative admission to JRMC; failed to obtain a cardiology consult; and failed to discontinue Lovenox and timely initiate treatment of Kim's

thrombocytopenia. Robinson, however, did not present expert testimony in support of these claims of negligence on the part of Dr. Ramiro, and this Court finds that expert testimony was required to evaluate Robinson's claims.[9] The Court does not doubt that Robinson is sincere in her belief that Dr. Ramiro was negligent, but Kim sadly suffered from serious and complex health problems and absent expert testimony supporting Robinson's allegations of negligence, she had no proof of the standard of care, deviation, or proximate cause – all essential elements of her claims. *Cf. Robson v. Tinnin, D.D.S.*, 322 Ark. 605, 611, 911 S.W.2d 246, 249 (1995) (matters relating to the changing of dental implants and treatment of fractured teeth are not matters of common knowledge).[10] Robinson refers to various medical articles and drug labeling as proof of Dr. Ramiro's negligence, but she does not have a medical expert to say that Dr. Ramiro's alleged action or inaction that may have been inconsistent with these materials was negligence.[11]

### III.

For the foregoing reasons, the Court finds that Robinson failed to prove (1) the degree of skill and learning ordinarily possessed and used by members of the profession of the medical care provider in good standing, engaged in the same type of practice or speciality in the locality

---

[9] Robinson also argues that Dr. Ramiro repeatedly committed perjury and altered medical records, but this Court, having observed Dr. Ramiro at trial, finds nothing in his testimony that would call into question his credibility, and there is no indication that medical records were altered.

[10] In contrast, Dr. Pennington, who reviewed the record for the government and stated that he is familiar with the standards of medical practice in the locality and is familiar with the skill and learning normally used by family practitioners in the locality, testified that he did not see anything that would show Dr. Ramiro did not meet the standards of care in the locality.

[11] *Cf. Ramon by and through Ramon v. Farr*, 770 P.2d 131, 135 (Utah Sup. Ct. 1989) (manufacturers' inserts and parallel Physician's Desk Reference entries do not by themselves set the standard of care, even as a prima facie matter).

in which he practices or in a similar locality, (2) that Dr. Ramiro failed to act in accordance with that standard, and (3) that such failure was the proximate cause of her's and Kim's injuries. Accordingly, the Court finds in favor of the United States and against Robinson and dismisses this action with prejudice. Judgment will be entered accordingly.

IT IS SO ORDERED this 31st day of March 2008.

/s/Susan Webber Wright
UNITED STATES DISTRICT JUDGE